Paul F. SHOEN, Plaintiff,

v.

AMERCO, a Nevada corporation; Edward J. Shoen, Mark V. Shoen, Aubrey K. Johnson, Richard J. Herrera, William E. Carty, Charles J. Bayer, John M. Dodds, and James P. Shoen, in their capacities as directors of AMERCO; AMERCO Employee Savings, Profit Sharing and Employee Stock Ownership Plan; Edward J. Shoen, Donald W. Murney, and Gary B. Horton, in their capacities as trustees of AMERCO Employee Savings, Profit Sharing and Employee Stock Ownership Plan, Defendants.

No. CV–N–94–0475–ECR.

United States District Court, D. Nevada.

Oct. 6, 1994.

Richard L. Elmore, Hale, Lane, Peek, Dennison & Howard, Reno, NV, Marc W. Rappel, Gary R. Ignatin, Latham & Watkins, Los Angeles, CA, Mark W. Smith, Latham & Watkins, San Francisco, CA, for plaintiff.

Paul J. Anderson, Walther, Ken, Maupin, Oats, Cox, Klaich & LeGoy, Reno, NV, and Kenneth B. Segel, Seeley, Segel, Goldman & Mazotta, P.C., Albany, NY, for defendants AMERCO Employee Sav., Profit Sharing & Employee Sav., Profit Sharing and Employee Stock Ownership plan.

Gregg W. Zive, Bible, Hoy, Trachok, Wadhams & Zive, Reno, NV, and James A. Ryan, Streich Lang, Renaissance One, Phoenix, AZ, and Jeffrey Willis, Streich Lang, P.A., Tucson, AZ, for defendant AMERCO, a Nev. Corp.

### MEMORANDUM AND ORDER

EDWARD C. REED, Jr., District Judge.

**I. BACKGROUND.**

AMERCO is a holding company. Its principal subsidiary is U–Haul International, Inc.

Paul Shoen ("Paul")[1] owns just under nine percent of AMERCO's common stock, with an appraised value of over $59 million.[2] Paul is trying to change the composition of AMERCO's board of directors and amend the company's bylaws. Hence this litigation. He has filed suit against AMERCO, its directors, its employee stock ownership plan (or "ESOP"), and the ESOP's trustees, alleging that they have violated federal securities laws and breached their fiduciary duties under Nevada corporation law (in the case of the AMERCO directors) and ERISA (in the case of the ESOP trustees).

Paul seeks a preliminary injunction appointing a neutral trustee for the ESOP, voiding any proxies already obtained, and barring AMERCO from holding its annual meeting until the company circulates "curative disclosures" and files proxy materials with the SEC.[3] Also, he seeks a temporary restraining order compelling the ESOP trustees to either forward his proxy solicitation materials to the ESOP's participants or provide him with a list of the participants so he can send those materials to them himself.[4] The motions for a preliminary injunction and a TRO will be considered together, as one consolidated motion seeking various forms of relief against AMERCO and the trustees.

Over ninety percent of AMERCO's voting common stock is held by L.S. Shoen, the founder of U-Haul, and his twelve children.[5] The AMERCO common stock not owned by members of the Shoen family is held by the ESOP (about 7.3%), Rappel Aff. Ex. II at 10, and, Paul states, by approximately 160 individuals (about 2.2%). Prelim. Motion at 2. AMERCO's common stock is not publicly traded and the company's bylaws give it a right of first refusal on all sales and transfers of its stock. Shoen Aff. ¶ 2.

The Shoen family is split into two factions.[6] One, led by Samuel ("Sam") Shoen and L.S. Shoen, controls about 47.21% of AMERCO's common stock. Rappel Aff. Ex. II at 7. The other faction, led by defendant Joe Shoen, controls the company. Joe's faction is held together by a shareholder agreement. Paul is, involuntarily, a member of Joe's faction, because his AMERCO shares are subject to the shareholder agreement, as are Sophia Shoen's and the ESOP's non-allocated AMERCO shares. Whoever controls a majority of the shares subject to the shareholder agreement gets to vote all of the shares subject to the agreement—currently, 47.56% of AMERCO's common stock, id. at 5, although this number will fall to 46.3% upon completion by Sophia Shoen of a sale of 500,000 of her shares. Id. at 10. Joe, Mark Shoen and James ("Jim") Shoen are directors of AMERCO. Id. at 5. Together, they hold a majority of the shares subject to the agreement and therefore can vote all of the shares subject to the agreement. Id. at 8 n. 1.

There are at least two threats to Joe's control of the company. First, Paul and Sophia are seeking to be released from the shareholder agreement. Id. at 10–11. If they are successful, Joe's faction will control only about 32.6% of AMERCO's common stock and could well lose control of the com-

1. There are numerous Shoens involved in this case. The principal players, for present purposes, are Paul Shoen and Edward J. ("Joe") Shoen. To avoid confusion, they will be referred to as Paul and Joe.

2. See Affidavit of Marc W. Rappel in Support of Plaintiff's *Ex Parte* Application for a Temporary Restraining Order ("Rappel Aff.") Ex. II (AMERCO Proxy Statement) at 8 n. 1; AMERCO Employee Savings, Profit Sharing and Employee Stock Ownership Plan and the ESOP Trustees' Opposition to Paul Shoen's Application for an Additional Temporary Restraining Order ("ESOP TRO Opp.") at 2 & n. 3.

3. See Plaintiff's Memorandum in Support of Motion for Preliminary Injunction ("Prelim. Motion") at 27–30.

4. See Plaintiff's Memorandum in Support of Application for Temporary Restraining Order Compelling Return of Proxy Materials Along With List of ESOP Participants, or in the Alternative, Compelling Mailing of Proxy Materials ("TRO Motion") at 8.

5. Affidavit of Paul F. Shoen in Support of Plaintiff's *Ex Parte* Application for Temporary Restraining Order ("Shoen Aff.") ¶ 2.

6. For a description of earlier family squabbles, see *Shoen v. Shoen*, 167 Ariz. 58, 804 P.2d 787 (1990).

pany. *Id.* That dispute has been submitted to arbitration. The parties suggested that the matter would be resolved by September 9, 1994. It is now more than three weeks after that date and the court has not been notified of a decision.

Second, of the 7.3% of AMERCO stock held by the ESOP, approximately 4.5% is either (1) not allocated (i.e., not assigned to an individual participant in the ESOP) or (2) allocated to the ESOP trust accounts of Joe, Mark, Jim, Paul and Sophia Shoen.[7] Only that 4.5% must, pursuant to the shareholder agreement,[8] be voted by the ESOP trustees in support of Joe's faction. *Id.* at 8 n. 1. The other 2.8% of AMERCO common stock held by the ESOP has been allocated to the accounts of the approximately 5,500 other individual ESOP participants. Each participant, as the beneficial owner of the AMERCO shares allocated to his or her account, can instruct the ESOP trustees how to vote those shares. *Id.* at 10. However, if a participant does not direct the trustees how to vote his or her allocated shares, then the trustees themselves vote the shares. Rappel Aff. Ex. KK at 4. So, the fewer ESOP participants who tell the trustees how to vote their allocated shares, the greater the number of shares that will, by default, be voted by the trustees in favor of incumbent management.

Without control of the allocated ESOP shares and after completion of Sophia Shoen's sale of 500,000 of her shares, but with the shareholder agreement still in effect, Joe's faction will therefore have firm control over only about 43.5% of AMERCO's total outstanding common stock.

The essential point, for present purposes, is this: as long as the shareholder agreement is in effect, the two Shoen factions control roughly equal numbers of shares in the company. Therefore, AMERCO's other individual shareholders, and the ESOP participants who direct the trustees how to vote the shares allocated to their individual accounts, will cast the swing votes in the company's upcoming elections.

At this year's annual meeting, the board seats held by Joe, Mark Shoen, and Aubrey Johnson are at stake. Each incumbent is running for re-election. *Id.*, Ex. HH at 2; Ex. II at 2–3. Paul is a candidate for the board seat currently held by Joe. Shoen Aff. ¶ 2. Paul states that Sophia Shoen, too, is a candidate for the board, and that members of Sam's faction are also running against the three incumbents. Prelim. Motion at 3. Moreover, Paul has submitted four proposals to be considered by shareholders at AMERCO's annual meeting. Shoen Aff. ¶ 4. One of those proposals would revise AMERCO's bylaws to eliminate the company's right of first refusal on sales and transfers of its stock, and is included in AMERCO's proxy materials pursuant to SEC Rule 14a–8. Rappel Aff.Ex. HH; *see* 17 C.F.R. § 240.14a–8. Losses in the board of directors elections could cost Joe's faction three seats on the board. Passage of the proposal to eliminate the company's right of first refusal on sales or transfers of its stock would diminish Joe's control of the company. Indeed, if members of Sam's faction were to purchase a sufficient number of AMERCO shares on the open market, Joe could lose control of the company.

Hence this dispute. In summary, Paul complains that AMERCO's board of directors, in collusion with the ESOP trustees:

(1) moved the date of the annual meeting forward by two months, in order both to preempt a possible arbitration decision terminating the shareholder agreement and to make it practically impossible for him to communicate effectively with the ESOP participants;

(2) solicited voting directions (*de facto* proxies) from the ESOP participants by means of premature, false and misleading proxy materials; and

---

7. Virtually all of this stock (1,758,536 shares) is not allocated; only 6,643 shares are allocated to individual parties to the shareholder agreement. *Id.* at 10.

8. The shareholder agreement must be distinguished from the registration rights agreement, discussed below, and from the AMERCO bylaw giving the company a right of first refusal on any transfers of its shares.

(3) improperly prevented him from communicating with the ESOP's participants, all in an attempt to maintain current management's control of the company and to ensure the defeat of both his proposals to the shareholders and his bid for election to the board of directors. *See generally* Prelim. Motion at 4–7. He seeks the relief described above.

## II. *JURISDICTION.*

The court has jurisdiction over the ERISA claims in this matter pursuant to 29 U.S.C. § 1132(e) and over the Securities Exchange Act claims pursuant to 15 U.S.C. § 78aa. The state corporation law claims are pendent.

## III. *STANDARD OF REVIEW.*

In this circuit,

'[t]o obtain a preliminary injunction, a party must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in [the movant's] favor. These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.'

In other words, '[w]here a party can show a strong chance of success on the merits, he need only show a possibility of irreparable harm. Where, on the other hand, a party can show only that serious questions are raised, he must show that the balance of hardships tips sharply in his favor.'

*MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 516–17 (9th Cir.1993) (citations omitted).

9. Again, it is important to remember that these are *separate* agreements.

10. Affidavit of Michael M. Fleming in Support of Plaintiff's *Ex Parte* Application for a Temporary Restraining Order ("Fleming Aff.") at ¶ 2.

## A. PROBABILITY OF SUCCESS ON THE MERITS.

### 1. *Facts.*

Paul is a party to a registration rights agreement—formally titled "Share Repurchase and Registration Rights Agreement"—with AMERCO, which provides that AMERCO must "take all steps necessary to register [Paul Shoen's AMERCO] shares and list such shares on a public exchange." Shoen Aff. at ¶ 6; Rappel Aff. Ex. II at 21. If AMERCO breaches this *registration rights* agreement, Paul can terminate the *shareholder* agreement.[9] *Id.; see also* Rappel Aff. Ex. II at 10–11, 23. On April 8, Paul notified AMERCO of his "submission of the dispute involving the Registration Rights Agreements to arbitration."[10] An arbitration decision favorable to Paul would result in termination of the shareholder agreement. Shoen Aff. ¶ 6. Moreover, such a decision would likely come before the traditional late September meeting date. *Id.* at ¶ 7. If so, Joe would probably lose control of AMERCO.

On April 27, AMERCO sought unsuccessfully to obtain a temporary restraining order enjoining the arbitration.[11]

On May 3, the board decided to advance the meeting date from late September to July 21.[12] The next day, May 4, the board received notice of Paul's candidacy for election as a director and of his proposals for consideration at the shareholders' meeting. *Id.*

The board did not notify Paul of the advanced meeting date; instead, he discovered it "during a deposition of AMERCO's general counsel in an unrelated matter" on May 26, 1994. Shoen Aff. ¶ 8; Rappel Aff. at 2.

On May 27, Paul requested that the board reconsider its decision to advance the date of the annual meeting. Rappel Aff. Ex. B.

On June 6, Joe, acting in his capacity as President of AMERCO, amended the ESOP.

11. Deposition Excerpts Cited in Plaintiff's Reply Memorandum in Support of Preliminary Injunction, Ex. B (Deposition of Gary Klinefelter as Designee of AMERCO ("AMERCO Dep.")) at 33.

12. Affidavit of Richard Amoroso ("Amoroso Aff.") ¶ 3 at 3.

Rappel Aff. Ex. KK at 5. Joe is also a trustee of the ESOP. Previously, according to Paul, the ESOP had required that participants submit proxies to the trustees at least ten days before the annual meeting. Prelim. Motion at 5. With the meeting scheduled for July 21, proxies would thus have had to be returned by July 11. According to Paul, AMERCO could not send out its proxy materials until July 8, due to SEC regulations. *Id.* This would make it almost impossible for participants to return proxies by July 11. Therefore, according to Paul, Joe amended the plan to require only that proxies be returned at least *two* days before the meeting, i.e., by July 19, thus making it possible for proxy materials to be sent out on July 8 and still returned in time for the meeting. *Id.*; Rappel Aff. Ex. KK at 4.

On June 16, AMERCO replied to Paul's May 27 request that it reconsider its decision to advance the meeting date. After justifying its decision to advance the meeting on various grounds (e.g., New York Stock Exchange policies, and cost savings from incorporation into AMERCO's SEC filings of items previously disclosed in its proxy statements), it nevertheless agreed to consider Paul's request. *See* Rappel Aff. Ex. J at 2. AMERCO requested that Paul give it until 5:00 p.m., June 30 to respond, *id.*, and Paul agreed. Rappel Aff. Ex. K.

During the last week of June, Paul claims, all ESOP participants received two documents that he terms "management solicitation[s]." *See* Prelim. Motion at 6. One was the June edition of *U–Haul News*, the monthly company newsletter. The newsletter is about twenty-three pages long. Pages six and seven contain a notice, dated June 20

and titled "Pass Through Voting Rights," from the ESOP trustees to the ESOP participants.[13] The second document was a flyer enclosed in the participants' payroll envelopes on June 24. *Id.* At this time, AMERCO had not yet provided proxy materials to its shareholders. Prelim. Motion at 6; AMERCO Answer at ¶ 39.

On June 30, fifteen minutes before the deadline for its response to Paul's request for reconsideration of the meeting date, AMERCO informed him that the meeting would go forward, as planned, on July 21. *See* Rappel Aff. Ex. L.[14] AMERCO cited two factors supporting its decision. First, "the logistics and planning that go into scheduling the annual shareholders meeting for a company the size of AMERCO." *Id.* Second, the recommendation contained in § 401.04 of the New York Stock Exchange's Listed Company Manual that companies hold their annual meetings "within a reasonable interval after the close of the fiscal year" and the fact that the majority of listed companies hold their meetings within three months of the end of the fiscal year.[15] *Id.*

On July 8, the trustees forwarded AMERCO's proxy materials to the ESOP participants, along with a 'Final Notice of Voting Rights' and a voting card.[16]

On July 12, Paul's own proxy materials were cleared by the SEC. TRO Motion at 2. On July 13 and 14, he delivered these materials to the ESOP trustees for mailing to the participants. *Id.* at 3.

On July 14, at a meeting of parties to the shareholder agreement, the trustees voted the non-allocated ESOP shares in favor of

---

13. *See* Answer of Defendants AMERCO, a Nevada Corporation; Edward J. Shoen, Mark V. Shoen, Aubrey K. Johnson, Richard J. Herrera, William E. Carty, Charles J. Bayer, John M. Dodds, and James P. Shoen, in Their Capacities as Directors of AMERCO to Plaintiff's Complaint ("AMERCO Answer") at ¶ 39 & Ex. A at 6–7; *see also* Complaint for Violation of the Federal Securities Laws and Breach of Fiduciary Duty and for Preliminary and Permanent Injunctive Relief ("Complaint") at ¶ 39.

14. Paul claims that the board simply lied, and in fact never even met to consider his request that it reschedule the meeting. Prelim. Reply at 2 (cit-

ing AMERCO Dep. at 26). The deposition passage he cites strongly suggests, but does not establish conclusively, that the board did not consider his request.

15. As noted above, AMERCO's common stock is not publicly traded. Apparently, however, the company is bound by NYSE rules because its non-voting preferred stock is traded on that exchange.

16. *See* Plaintiff's Reply Memorandum in Support of Motion for Preliminary Injunction ("Prelim. Reply") Ex. B–5; Rappel Aff. Ex. II.

incumbent management and against Paul's shareholder proposal.[17]

On July 15, the ESOP trustees met and decided "that Paul Shoen's proxy materials should not be forwarded to ESOP participants as there was insufficient time for participants to review the information and make an informed decision as to the positions contained therein." [18]

On July 20, this court, acting on an application from Paul, issued a TRO enjoining AMERCO from holding its annual meeting on July 21. That TRO was amended on July 21 to enjoin the meeting until September 24.

Since then, the parties have been sparring over Paul's demand that the ESOP trustees either mail his proxy materials to the ESOP participants or return the materials to him, along with mailing labels and the participants' addresses.[19] Apparently the ESOP trustees are willing to return the proxy materials. *See* ESOP TRO Opp. at 7. What they are not willing to turn over is a list of ESOP participants or mailing labels with the participants' names and addresses. *Id.*

### 2. The Decision to Advance AMERCO's Annual Meeting Date.

■ The directors of a corporation are fiduciaries and owe a duty of loyalty to the shareholders. *Horwitz v. Southwest Forest Industries, Inc.*, 604 F.Supp. 1130, 1134 (D.Nev.1985). In determining whether that duty has been breached, a director's actions

typically are analyzed under the "business judgment" rule. *Id.* The rule provides that "if directors' actions can arguably be taken to have been done for the benefit of the corporation, then the directors are presumed to have been exercising their sound business judgment" rather than acting in their own self-interest, and "[t]he burden of showing bad faith rests upon the plaintiff." *Id.* at 1135.

Because directors' decisions will give rise to liability to the shareholders only if those decisions fail to satisfy the business judgment rule, and because that rule is deferential and thus easy to satisfy, shareholders normally have "only two protections against perceived inadequate business performance. They may sell their stock ..., or they may vote to replace incumbent board members." 564 A.2d at 659. Indeed, one of the justifications for the business judgment rule's insulation of directors from liability for almost all of their decisions is that unhappy shareholders can always vote the directors out of office. Thus, interference with shareholder voting is an especially serious matter, not to be left to the directors' business judgment, precisely because it undercuts a primary justification for allowing directors to rely on their judgment in almost every other context. Put another way, "the ordinary considerations to which the business judgment rule originally responded are simply not present in the shareholder voting context," *Blasius Indus. v. Atlas Corp.*, 564 A.2d 651, 659

---

**17.** Affidavit of Paul F. Shoen in Support of Plaintiff's Motion for Preliminary Injunction ("Supp. Shoen Aff.") at ¶¶ 2–4.

**18.** ESOP's "Opposition to Motion for Preliminary Injunction" ("ESOP Prelim. Opp."), Ex. A (Affidavit of Donald W. Murney ("Murney Aff.")) at ¶ 13.

**19.** *See* Affidavit of Mark W. Smith in Support of Plaintiff's Application ("Smith Aff.") at 1–2, Exs. A–F; TRO Motion at 3. Paul sought to enforce that demand by filing for a temporary restraining order on July 26. *See* TRO Motion. In his application, Paul noted that "[i]f the court concludes that the materials should not be sent pending further briefing, plaintiff respectfully submits that any further solicitation efforts by the trustees and management, and anyone acting in their behalf, must be enjoined." *Id.* at 8 n. 2. AMERCO's counsel had informed Paul's counsel a few days earlier that "AMERCO, its officers, agents and attorneys, will *not* violate the Court's

order by engaging in any type of proxy solicitation, either on its own behalf or on behalf of any shareholder," until further rulings from this court. Smith Aff. Ex. D at 2. AMERCO has given express assurances to the court to the same effect. *See* AMERCO's Opposition Memorandum to Plaintiff's Application for Temporary Restraining Order and AMERCO's Motion to Increase Bond ("AMERCO TRO Opp.") at 1. So have the ESOP trustees. *See* ESOP TRO Opp. at 2; Affidavit of Gary B. Horton ("Horton Aff.") at ¶¶ 4–5.

Taking the defendants at their word, there was no need for the court to act immediately on Paul's TRO application. The matter was set on for further briefing. That briefing is relevant here because Paul still demands that the trustees either mail his materials to the participants or return the materials to him with a list of participants' addresses.

(Del.Ch.1988), because when a board interferes with shareholder voting it interferes with the very "allocation, between shareholders as a class and the board, of effective power with respect to governance of the corporation." *Id.* at 660.[20]

■ Therefore, while "the reasonable exercise of good faith and due care generally validates, in equity, the exercise of legal authority *even if* the act" has the *effect* of entrenching incumbent board members, *id.* at 659 (emphasis added), "action designed for the *primary purpose* of interfering with the effectiveness of a stockholder vote" is subject to a standard of review more demanding than the business judgment rule. *Id.* (emphasis added).[21] In such a case, the board bears "the heavy burden of demonstrating a compelling justification for such action." *Id.* at 661.[22] It is this concern "for credible corporate democracy[ ] [that] underlies those cases that strike down board action that sets or moves an annual meeting date upon a finding that such action was *intended* to thwart a shareholder group from effectively mounting an election campaign." *Blasius,* 564 A.2d at 659 n. 2 (emphasis added); *see also Schnell v. Chris–Craft Indus., Inc.,* 285 A.2d 437 (Del.1971); *Lerman v. Diagnostic Data, Inc.,* 421 A.2d 906 (Del.Ch.1980).[23]

■ Section 1 of AMERCO's bylaws provides that the annual stockholders' meeting "shall be held on the last Saturday of September of each year at a time of day and place as determined by the Board of Directors, or on such other date as may be

---

**20.** Because the "powers of corporate directors are determined by state law[,] [i]t is the law of the state of incorporation that is controlling." *Horwitz,* 604 F.Supp. at 1134. AMERCO is a Nevada corporation. Where there is no Nevada precedent on point, as is frequently the case, this court must predict how Nevada's supreme court would decide the question. In doing so, we may look to decisions from other states for guidance. *Id.* On questions of corporation law, the Delaware Supreme Court and the Delaware Courts of Chancery are persuasive authorities.

**21.** This is so even where the board acts, not out of self-interest, but rather with "subjective good faith"—because the board members "held a good faith belief that such shareholder action would be self-injurious and shareholders needed to be protected from their own judgment." *Id.* at 658.

**22.** AMERCO argues that it need *not* show a "compelling justification" for the board's decision to hold the meeting in July and cites cases standing, it claims, for the proposition that "the business judgment rule is not disregarded simply because a company's board of directors seeks to maintain control of a corporation." AMERCO's Opposition to Plaintiff's Motion for Preliminary Injunction ("AMERCO Prelim. Opp.") at 13. A lengthy discussion of the business judgment rule follows. *Id.* at 13–17.

The argument is not persuasive. AMERCO cites cases in which the corporation's directors, faced with a hostile tender offer, were held only to the "business judgment" standard in formulating a response. A 1991 Nevada statute to the same effect gives directors wide discretion to resist a "change in control" of the corporation. *See* NEV. REV. STAT. § 78.138(4). The statute provides, in brief, that the directors may resist a change in control for two general reasons: either because they believe it would not be in the interests of the corporation's stockholders, employees, suppliers, creditors, customers, the state and national economies, and the interests of the community and society, *see* N.R.S. § 78.138(3), (4)(a); or because they have reasonable grounds to believe that the change would cause the corporation to become insolvent or bankrupt, *see* N.R.S. § 78.138(4)(b).

The response, briefly, is that a hostile tender offer is not the same thing as a shareholders' vote against incumbent management. The text of § 78.138(4) makes clear that the statute is an anti-takeover provision, designed to give directors greater discretion to resist hostile tender offers by allowing them to consider factors other than the shareholders' immediate financial gain. *See* Keith Paul Bishop, *Nevada Corporation Law and Practice* § 9.5, at 240 (1993) ("[t]he statute is clearly directed at the practice in the 1980's of financing hostile tender offers with ... 'junk bonds' "). As the Delaware Court of Chancery made clear in *Blasius,* 564 A.2d at 660, directors' actions in response to a hostile tender offer may be subject to the business judgment rule, but this will not insulate from more searching review directors' actions taken to defeat a threat from insurgent shareholders by interfering with their voting rights. *See* Prelim. Reply at 7 n. 8.

**23.** Of course, manipulation of meeting dates is not the only method at the board's disposal should it wish to interfere with the "free and effective exercise of voting rights." *Blasius,* 564 A.2d at 659. n. 2. Hence the requirement that the corporation disclose to shareholders all material information in its possession when it asks them to approve a transaction, even if the transaction is not a self-dealing one, *id. (citing, e.g., Smith v. Van Gorkom,* 488 A.2d 858 (Del.1985)), and the invalidation of "stock issued for the primary purpose of diluting the voting power of a control block." *Id. (citing, e.g., Condec Corp. v. Lunkenheimer Co,* 230 A.2d 769 (Del.Ch.1967)).

determined by the Board of Directors." In the past, the annual meeting has almost always been held on the last Saturday in September. *See* Shoen Aff. ¶ 7; Amoroso Aff. ¶ 3 at 2. This year, however, the AMERCO board voted on May 3 to move the meeting date from September 24 to July 21.

> Paul characterizes the situation as follows: At the time of its decision to change the meeting date, the AMERCO board knew that it would be impossible to delay the arbitration hearings beyond the normal late September meeting date, and that an unfavorable decision in these hearings would dramatically increase the possibility that incumbent management would lose the election. The board also made its decision the day before the last day on which a shareholder could submit a proposal, thus dramatically compressing the proxy period for any proposals submitted. Even worse, the Board kept the change secret to prevent Paul Shoen from attempting to expedite the arbitration or accelerate his proxy campaign, and ignored his requests to reconsider the decision for almost three weeks.

Prelim. Motion at 11–12. Given the facts, he argues that the only reasonable inference is that the board acted for the purpose of interfering with other shareholders' voting rights:

> [A]dvancing the meeting obviously impeded competing proxy solicitations; indeed, if plaintiff had not discovered the new date by accident in late May, his first notice of the annual meeting would have been the receipt of AMERCO's proxy materials on July 11. Of course, advancing the meeting also threatened to circumvent plaintiff's arbitration proceedings, depriving plaintiff of the right to vote his own stock and assuring that Joe Shoen would vote it for him.

Prelim. Reply at 8. Therefore, he argues, the board's actions should be subject to the "compelling justification" test. The court agrees.

AMERCO responds, initially, by noting that Nevada law and the company's bylaws permit the board to set the time, place and date of the annual meeting, and argues that the board therefore acted well within the discretion delegated to it. AMERCO Prelim.Opp. at 10–11. That is literally true but misses the point. The best explanation comes from the Delaware Supreme Court:

> When the by-laws of a corporation designate the date of the annual meeting of stockholders, it is to be expected that those who intend to contest the reelection of incumbent management will gear their campaign to the by-law date. It is not to be expected that management will attempt to advance the date in order to obtain an inequitable advantage in the contest.
>
> Management contends that it has complied strictly with the provisions of the new Delaware Corporation Law in changing the by-law date. The answer to that contention, of course, is that inequitable action does not become permissible simply because it is legally possible.

*Schnell,* 285 A.2d at 439.

AMERCO then argues, in effect, that no harm has been done, because Paul's "argument presupposes that the shareholders' right to vote was adversely affected," when in fact "[t]his simply is not the case—while the date was set prior to its historical date, no shareholder has lost any right to vote." AMERCO Prelim.Opp. at 12. What AMERCO ignores, however, is that while shareholders still can vote their shares freely, the range of choices available to them has been narrowed by the advancement of the meeting date and Paul's consequent inability to campaign. "[T]he unadorned right to cast a ballot in a contest for office," after all, "is meaningless without the right to participate in selecting the contestants." *Hubbard v. Hollywood Park Realty Enters.,* Civil Action No. 11779, 1991 WL 3151, at *6, 1991 Del.Ch. LEXIS 9, at *18–*19 (Del.Ch.1991) (*quoting Durkin v. Nat'l Bank of Olyphant,* 772 F.2d 55, 59 (3rd Cir.1985)).

Next, AMERCO asserts that, "[c]ontrary to [Paul's] unfounded accusations, there was no manipulation of the meeting date to garner an advantage for management or deny [Paul] any right to which he is entitled." AMERCO Prelim.Opp. at 11. Management, it asserts, had "several legitimate business justifications" for holding the meeting in July

rather than September. *Id.* Specifically, "[t]he SEC, New York Stock Exchange, AMERCO creditors, and other AMERCO shareholders, all encourage the company to hold its annual ... meeting as close to the end of its fiscal year [March 31] as practicable." *Id.* Paul responds by demonstrating that a change in the meeting date was not *required* by the SEC or the NYSE,[24] and that the claimed cost savings—from incorporation by reference into AMERCO's Form 10–K of information from its proxy statement—could have been achieved without advancing the meeting date.[25] Also, he claims that the decision to advance the meeting to July 20, though proper in light of one precatory provision in the NYSE's manual, put AMERCO in violation of another such provision, which suggests a thirty-day interval between mailing of the proxy statement and the meeting.[26]

Paul also responds to the AMERCO's claim that "logistics and planning" considerations, *see* Rappel Aff. Ex. L, weighed against moving the meeting date back to September. He points out that the meeting generally lasts less than two hours, *see* Shoen Aff. ¶ 10, and is held in the remote desert town of Tonopah, Nevada, at a hall that costs $25 to rent. *See* Supp. Shoen Aff. at ¶ 25. AMERCO itself states that no more than twenty shareholders typically attend the meeting. AMERCO Dep. at 29.

Finally, AMERCO argues, the business judgment rule applies in this case because there is simply no reason to think that the board's purpose in advancing the meeting date was to impede shareholders' exercise of their franchise. In the cases Paul cites, AMERCO argues, the board took action which "blatantly affected the stockholder voting process," AMERCO Prelim.Opp. at 12—for example, postponing the annual meeting the night before it was to be held. In this case, AMERCO claims, the facts are different. Here, by contrast,

> the board set the annual meeting date well before it was to occur, before proxy solicitation materials were prepared or distributed, before the ESOP Trustees explained to participants the pass-through voting procedures, and before the board received notice of [Paul's] proposals.... '[B]ad faith' ... is not present in this case. The requisite effect on the right to vote is absent....

*Id.* at 12–13. The court simply disagrees with this assessment of the facts. AMERCO may not have been aware, at the time it changed the date of its annual meeting, of

---

**24.** Nor even requested by the NYSE. *See* AMERCO Dep. at 42.

**25.** *See* Prelim. Motion at 12 n. 5:

Because AMERCO's fiscal year ended on March 31, 1994, its annual report on Form 10–K was due by (and filed on) June 29, 1994, and the company could have incorporated by reference information from its proxy statement so long as the definitive proxy statement was filed no later than July 29, 1994. *See* Form 10–K [Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934] General Instructions A, G(3)[, Fed.Sec.L.Rep. (CCH) ¶ 31,-102, at 22,061 (Apr. 21, 1993)]. Because Nevada law requires the company to deliver notice of the annual meeting not more than 60 days prior to the meeting date, *see* [NEV.REV.STAT.] § 78.370(3), AMERCO could have mailed its definitive proxy statements on July 29, 1994[,] and still held the meeting as late as September 27, 1994. This date is three days *after* the [last Saturday in September, 1994].

**26.** *See* Prelim. Motion at 12 n. 6:

The board stated that it needed to advance the annual meeting to comply with a portion of

section 401.04 of the NYSE Listed Company Manual, which states that "[t]he Exchange believes that the annual meeting should be held within a reasonable interval after the close of the fiscal year so that the information in the annual report is relatively timely."

The immediately preceding language of this section states, however, that "[t]here is no [NYSE] requirement relating to the interval between the end of a company's fiscal year and the date of its annual meeting of shareholders." *Id.* Not only is this provision precatory, but also the NYSE is not likely to care whether the holders of AMERCO's NYSE–listed stock are invited to a meeting in July or a later date, because AMERCO's only NYSE–listed security is preferred stock that has no voting rights. Moreover, the advancement of the meeting ran afoul of section 402.05 of the Manual, which suggests that AMERCO provide at least a 30-day period between mailing its proxy materials and holding its annual meeting. AMERCO provided less than half of this minimum suggested notice.

Paul has not provided the court with a complete copy of § 402.05 of the NYSE manual, so his claim cannot be verified. *See* Plaintiff's Appendix of Non–Federal Authorities, Tab 21.

Paul's candidacy for the board and shareholder proposals. But AMERCO certainly was aware of his attempt to terminate the shareholder agreement; indeed, it had sought only a week earlier to enjoin the arbitration. That attempt was unsuccessful. The board, controlled by Joe's faction, thus had ample reason to advance the date of the meeting, so that Joe would be able to vote all the shares subject to the agreement before its potential termination by the arbitrator's decision. Moreover, the justifications offered by AMERCO—whether "logistics and planning," cost savings under SEC regulations, or compliance with suggestions in the NYSE Listed Company Manual—all ring hollow, as Paul has made a strong showing that they are pretextual. These factors, coupled with the contemporaneous actions of AMERCO and the ESOP trustees, described below, in soliciting voting directions from the ESOP participants, lead the court to conclude, for purposes of this motion, that the meeting was advanced for the purpose of interfering with free and fair voting by the shareholders, by incumbent managers afraid that they would lose an election held in late September. The board's decision to advance the meeting is therefore properly subject to the "compelling justification" test. AMERCO has offered no justification that is convincing, let alone compelling. The board, at least at this preliminary stage of the case, appears very clearly to have violated its fiduciary duties and the meeting was therefore properly enjoined.

### 3. *Violations of Section 14 of the Securities Exchange Act.*

Four different communications went to the ESOP participants: (a) the two-page story in the June 1994 company newsletter, *see* Rappel Aff. Ex. HH; (b) the June 24 payroll envelope insert, *see* AMERCO Answer Ex. A at 6–7; (c) the July 8 "Final Notice of Voting

Rights," *see* Rappel Aff. Ex. II; and (d) AMERCO's July 8 proxy statement, accompanied by a "Notice of Annual Meeting of Stockholders" and a list of "Annual Meeting Procedures," *see id.* The first three came from the ESOP trustees; the last, from AMERCO itself.[27]

Section 14(a) of the Securities Exchange Act of 1934, and SEC rules promulgated thereunder, set the rules for proxy solicitation. Based on these communications, Paul makes three separate claims against the trustees and AMERCO under Section 14. First, he claims that the trustees engaged in premature solicitation under Rule 14a–3 by sending out the flyer and placing the article in the company newsletter before AMERCO's proxy statement was furnished to the ESOP participants. Prelim. Motion at 22. Second, he claims that AMERCO violated Rule 14a–6 by sending its proxy statement to shareholders before filing it with the SEC. *Id.* at 21. Finally, he claims that both AMERCO and the trustees violated Rule 14a–9, as interpreted by the Court, *see TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), by omitting various material facts. *Id.* at 23–25.

#### a. Rule 14a–3.

Rule 14a–3 forbids solicitation "unless each person solicited is concurrently furnished or has previously been furnished with a publicly-filed preliminary or definitive written proxy statement...." 17 CFR § 240.14a–3(a). AMERCO admits that the newsletter and flyer were distributed before it furnished proxy statements to the participants. AMERCO Answer ¶ 39. The ESOP trustees deny any wrongdoing, but state that "to the extent the charging allegation contains reference to various documents, [the ESOP and its trustees] allege that the documents speak for themselves."[28]

Given the fact that the three ESOP trustees are Joe Shoen, the current Chairman of the Board of AMERCO, and two long-time AMERCO employees, and in light of the trustees' behavior in this matter, detailed below, it would seem that, realistically, the trustees are inseparable from current AMERCO management.

**27.** The materials were *sent* to the participants by the trustees. However, Paul explains that, because discovery has not yet commenced, he "cannot be certain whether the flier and newsletter were *prepared* by the trustees or the board." Prelim. Motion at 22 & n. 11 (emphasis added). As noted above, the court will assume that the first three communications came from the trustees, since they are so labelled.

**28.** Answer to Complaint for Violation of the Federal Securities Law and Breach of Fiduciary

The documents do indeed speak for themselves. First, the timing of their distribution is not in dispute. Each is dated June 20, and the trustees' "Final Notice of Voting Rights," dated July 8, tells the participants that "[b]y now, you should have read the June 1994 *U-Haul News* story and received a flier in your June 24 payroll envelope. . . ." Rappel Aff. Ex. II. AMERCO's proxy statement was distributed July 8. So the newsletter and flier *did* go to the participants before they had been furnished with AMERCO's proxy statement.

AMERCO comes to the trustees' defense by arguing that the newsletter and flyer were not "solicitations." "The focus of the payroll flyer and Amerco newsletter," AMERCO explains, "was to describe the complex ESOP 'pass-through' voting process and to encourage ESOP participants to vote. . . ." AMERCO Prelim.Opp. at 20. That Paul's proposal to repeal the company's right of first refusal, and the company's opposition to that proposal, were "summarized" in these materials, it argues, does not make the materials "solicitations." *Id.* at 20–21.

Nonsense. "Solicitation" includes, among other things, "furnishing a form of proxy or other communication to security holders under circumstances reasonably calculated to result in the procurement . . . of a proxy." 17 CFR § 240.14a–1(1)(1)(iii). The newsletter and flyer are clearly "solicitations." True, each contains a neutral explanation of the basic idea behind "pass-through voting": that ESOP participants can direct the trustees how to vote the AMERCO shares allocated to their individual accounts. But neither document stops there.

First, the newsletter contains pictures of all incumbent directors. In the bottom right corner of Joe Shoen, Mark Shoen and Aubrey Johnson's pictures—they are the three directors up for re-election—is a check mark and the word "VOTE!". The obvious suggestion is that the ESOP trustees, who sent this newsletter message, favor the three incumbents.[29] No mention is made of the other candidates for the three open director seats.

Second, at the top of the page is a bar graph purporting to represent the increasing appraised value of AMERCO stock since 1989. The bars are grossly disproportionate. For example, the 1993 appraised value of $17 is represented by a bar about four times as tall as the one representing the 1990 appraised value of $9.20. Given those values, an accurate graph would contain a bar for 1993 not quite twice as tall as the 1990 bar. The obvious effect of this distortion is to give the casual reader—and most ESOP participants, who are company employees, will likely be casual readers rather than sophisticated investors—an impression of share-value growth far more impressive than the facts warrant. Third, under the label "SHAREHOLDER PROPOSAL," part of Paul's statement supporting his proposal is quoted alongside the directors' statement in opposition. Below these passages, in much larger, boldface type, is this statement: "The Board of Directors recommends a "NO" vote on this proposal for the above reasons." Finally, the text on page seven contains the following panegyric to current management:

A successful company doesn't happen overnight. It takes incredible business insight and the ability to set achievable long-term goals for the company. That's where the Amerco Board of Directors have played a vital role in making the decisions that have gotten us where we are today and will take us to where we want to go tomorrow.

The payroll envelope insert contains similar editorial content on behalf of incumbent management. It too contains a distorted bar graph, mentions that the three incumbent directors are up for re-election without mentioning any other candidates, and again notes, in large, boldface letters, the board's opposition Paul's shareholder proposal.

In their opposition to Paul's motion for a preliminary injunction, the ESOP trustees do not respond to his allegation that they violated Rule 14a–3. *See* ESOP Prelim.Opp. That is just as well. Had the trustees limited their materials to truly impartial instructions explaining pass-through voting, and had they promptly forwarded to the participants

---

Duty and for Preliminary and Permanent Injunctive Relief ("ESOP Answer") ¶ 31.

**29.** And, of course, Joe Shoen is both an incumbent director *and* an ESOP trustee.

Paul's proxy materials as well, they might have been exempted, under Rule 14a–2(a)(1), from the other requirements of Rule 14a. But they did not restrain themselves and were not exempted. The newsletter and flyer were clearly solicitations, distributed by the trustees before proxy materials were sent to the participants. The trustees violated Rule 14a–3.

### b. Rule 14a–6.

■ Rule 14a–6 requires that proxy materials be filed with the SEC ten days before they are sent to shareholders. 17 CFR § 240.14a–6(a). But a registrant need not file its proxy materials or other solicitation materials with the SEC if they relate to a meeting at which "the only matters to be acted upon are [among other things] ... a security holder proposal included pursuant to Rule 14a–8." 17 CFR § 240.14a–6(a)(3). AMERCO argues that it qualifies for this exemption and that it "declined to discuss non–Rule 14a–8 proposals in its proxy materials" precisely *because* it did not want to file its preliminary proxy statement with the SEC. AMERCO Prelim.Opp. at 21. This is simply beside the point. What AMERCO chooses to discuss in its proxy materials is not the issue. The rule requires, in relevant part, that AMERCO file its proxy materials with the SEC unless the *only* matter to be acted upon at the meeting is a shareholder proposal included in the company's proxy statement under Rule 14a–8. As Paul points out, one of his proposals was included under Rule 14a–8, but he has also made three other proposals; these were not included in AMERCO's proxy materials but *will* be acted upon at the shareholder meeting. *See* "Notice of Annual Meeting of Stockholders," Rappel Aff. Ex. II. Because matters will be acted upon at the meeting which were not included in the proxy materials pursuant to Rule 14a–8, AMERCO was required to file its proxy materials with the SEC before sending them to shareholders.[30] It did not and thus violated Rule 14a–6.

### c. Rule 14a–9.

■ Rule 14a–9 prohibits any solicitation containing materially false or misleading information. 17 CFR § 240.14a–9(a). An omitted fact is "material" if there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Paul claims that both AMERCO's proxy materials and the trustees' solicitations failed to state material facts. Prelim. Motion at 24–25. He objects principally to the following omissions:

(1) AMERCO's proxy statement refers to Paul's proposal to eliminate the right of first refusal, but does not mention his other three proposals. "Shareholders therefore have no warning that granting a proxy to management will disable them from voting on these proposals, and have no information about the proposals that would allow them to intelligently decide whether to give up their right to vote on them." *Id.* at 24.

(2) Both AMERCO's proxy statement and the trustees' solicitations fail to mention "the fact that the appraised value of AMERCO stock is discounted by 15 percent due to the current illiquidity caused by the lack of a public market for AMERCO shares, and the fact that the right of first refusal prevents such a public market." *Id.*

(3) The proxy statement does not mention Mark Shoen's altercation with a process server attempting to serve him with papers in connection with this case. *Id.* at 25.

Paul contends that all of these omissions are material because reasonable shareholders would consider them in deciding how to vote. AMERCO simply announces that the omissions are not material. AMERCO Prelim.Opp. at 18. The omissions will be considered *seriatim:*[31]

---

**30.** AMERCO refers, in passing, to Rule 14a–6(a)'s provisions regarding "solicitations in opposition." AMERCO Prelim. Opp. at 21. This is irrelevant because AMERCO does not qualify for an exemption from 14a–6(a)'s filing requirement in the first place.

**31.** Analysis is made more difficult because neither side cites case law specifically addressing the *type* of omissions at issue.

■ (1) AMERCO argues that it was not obligated to discuss Paul's shareholder proposals (having included one of them in its proxy materials pursuant to Rule 14a–8) or the other candidates for the board of directors. *See* AMERCO Prelim.Opp. at 19 (citing Rule 14a–8). This may be so; Paul does not argue the point. But in any event, it seems clear that AMERCO *was* obligated to explain in its proxy materials that other security-holder proposals can be brought up at the meeting and that the proxy will be voted on those matters as the proxy holder sees fit. *See* IV L. Loss & J. Seligman, *Securities Regulation* 1968 n. 124 (1989) ("When a security holder proposal has been excluded pursuant to Rule 14a–8, it still may be presented at the meeting" and "the registrant's proxy statement should disclose the possibility that omitted security holder proposals may be raised at the meeting and the proxies will be voted in the discretion of the proxy holder") (*citing* SEC, Div. of Corp. Fin., *Disclosure Operations: Proxy Rules Reference Book* 38 (1980)).[32]

■ (2) Paul contends that AMERCO should have disclosed that its stock is discounted by 15% because there is no public market for it. AMERCO's response is that if Paul thought this information was important, he should have included it in his "Supporting Statement" in favor of his shareholder proposal, included in the company's proxy statement. That is not a persuasive response. AMERCO put out the proxy statement and AMERCO was responsible for avoiding omissions of material fact. The question, then, is whether the fact was material. There is some authority in this circuit supporting the proposition that "financial projections and professional opinions" obtained by a registrant may have to be disclosed under the proxy rules. *See Plaine v. McCabe*, 790 F.2d 742, 752 (9th Cir.1986); *Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1121 (9th Cir.1982), *cert. denied*, 460

U.S. 1029, 103 S.Ct. 1281, 75 L.Ed.2d 501 (1983). However, the genesis of the "15% discount" claim—i.e., whether it is an estimate obtained by Paul or by AMERCO itself—is unclear from Paul's motion. Also, he has not briefed the legal question. Paul has the burden of showing a probability of success on the merits and has not yet done so. At this stage of the proceedings, the court cannot say that AMERCO violated Rule 14a–9 by omitting mention of the discount.

■ (3) The SEC's Regulation S–K applies to various documents, including proxy statements. 17 CFR § 229.10(a)(2). It requires, among other things, that the proxy statement disclose if a director is a "named subject of any criminal proceeding." 17 CFR § 229.401(f)(2). During the course of this litigation, Mark Shoen allegedly attempted to avoid service of process at his residence and threatened a process server with a gun.[33] The process server reported the incident to a sheriff's deputy, *id.,* who said he would refer the matter to the local prosecutor. *Id.* While the report may have been referred to the district attorney, that is a far cry from establishing that Mark Shoen is a "named subject of [a] criminal proceeding." Paul has not established, for purposes of this motion for preliminary relief, that AMERCO's failure to supplement its proxy materials to include this incident was a violation of Rule 14a–9.

■ Based on the foregoing, it appears clear that AMERCO's proxy statement omitted mention of at least one material fact. Moreover, although Paul does not raise the point, some mention must be made of the "voting card" sent by the trustees to the ESOP participants on July 8. *See* Prelim. Reply Ex. B–5. Professor Loss has explained that, with respect to the "form of proxy" itself (i.e., the proxy card),

[a]mong the forbidden devices are . . . 'the use of . . . visual device[s] designed to

---

**32.** It would not seem to make any difference that in this case AMERCO *itself* "is not soliciting proxies in respect of these matters," *see* Rappel Aff. Ex. II ("Notice of Annual Meeting of Stockholders")—the trustees are soliciting on AMERCO's behalf—since the statement holds true no matter who the proxy holder is.

**33.** Affidavit of Susan Speak in Support of Plaintiff's Motion for Preliminary Injunction ("Speak Aff.") at 2–3.

direct the stockholder's attention to the place on the proxy for voting one way and away from the place for voting the contrary, *and the switching of boxes in order to procure the result desired by the management.'*

IV L. Loss & J. Seligman, *Securities Regulation* 1970–71 & n. 131 (1989) (*quoting* Sec.Ex. Act Rel. 4185 (1948)) (emphasis added). An examination of the voting card shows that this is precisely what the trustees have done. The boxes have been switched, with the left hand column containing green boxes indicating the choices recommended by AMERCO's board and the right hand column containing red boxes. At the top of the card is a graphic depiction showing how each box is to be marked; it shows a green box being shaded in and labels this as the "correct" way to vote. All of this, despite the fact that the voting card tells participants that the pass-through vote is "solicited on behalf of the ESOP trustees." This court is of the opinion that the trustees thus violated Rule 14a–4, in addition to the other violations charged above. The violation is sufficiently egregious that it is properly raised *sua sponte.*

### 4. *Violations of Fiduciary Duties Under ERISA.*

█ The trustees are fiduciaries and their conduct is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1001 *et seq.* As a general matter, ERISA requires that an ESOP trustee

> discharge his duties 'solely in the interest of the participants and beneficiaries.' He must do this 'for the exclusive purpose' of providing benefits to them. And he must comply 'with the care, skill, prudence, and diligence under the circumstances then prevailing' of the traditional 'prudent man.'

*Donovan v. Bierwirth,* 680 F.2d 263, 271 (2nd Cir.1982) (Friendly, J.).

█ In a contest for control of the corporation, there are special problems.[34] One concerns the conduct of individuals who serve in a dual capacity, both as trustees of the ESOP and as officers, directors or employees of the "plan sponsor" (i.e., the company). The potential conflict of interest is obvious, as is the proper course of action: "[t]rustees of an [ESOP] must discharge their duties by evaluating the best interests of the beneficiaries in the abstract as beneficiaries, not as directors who may lose control of the company nor as employees, some of whom may lose their jobs if control of the company changes hands." *Central Trust Co., N.A. v. American Avents Corp.,* 771 F.Supp. 871, 874–75 (S.D.Ohio 1989) (citation omitted). *Bierwirth* "suggests two avenues for the analysis of conduct of trustees with dual loyalty." *Ches v. Archer,* 827 F.Supp. 159, 169 (W.D.N.Y. 1993). If "the conflict of interests is so great that it is virtually impossible for the fiduciary to discharge the duties with an eye single [sic] to the beneficiaries' interest," *Newton v. Van Otterloo,* 756 F.Supp. 1121, 1127 (N.D.Ind.1991) (*citing Leigh v. Engle,* 727 F.2d 113 (7th Cir.1984) (*citing Bierwirth,* 680 F.2d at 271)), then

> the preferred course of action for a fiduciary of a plan holding or acquiring stock of a target, who is also an officer, director or employee of a party-in-interest seeking to acquire or retain control, is to resign and clear the way for the appointment of a genuinely neutral trustee to manage the assets involved in the control contest.

*Danaher Corp. v. Chicago Pneumatic Tool Co.,* 635 F.Supp. 246, 250 (S.D.N.Y.1986) (*quoting Leigh v. Engle,* 727 F.2d 113, 122 (7th Cir.1984); *see also Ches,* 827 F.Supp. at 169. Then again, there are cases in which the conflict of interest, though substantial, "is not so great as to require the trustee's resignation. . . ." *Newton v. Van Otterloo,* 756 F.Supp. 1121, 1127 (N.D.Ind.1991) (*citing Leigh v. Engle,* 727 F.2d 113 (7th Cir.1984) (*citing Bierwirth,* 680 F.2d at 271)). The question in such cases is "whether the fiduciary engaged in an intensive and independent investigation of options to ensure that the action taken was in the shareholders' best interest," *id.,* and one element of this inquiry is "the extent to which the use of the

---

**34.** While the situation here is not a "control contest" in the same way that, say, a hostile tender offer is, it comes close enough: a major shareholder has made a proposal which, if adopted, would severely weaken incumbent management's control of the company.

trust's assets tracked the best interest of another party." *Id.* As Judge Friendly put it:

> Although officers of a corporation who are trustees of its pension plan do not violate their duties as trustees by taking action which, after careful and impartial investigation, they reasonably conclude best to promote the interests of participants and beneficiaries simply because it incidentally benefits the corporation or, indeed, themselves, their decisions must be made with an eye single to the interests of the participants and beneficiaries. This, in turn, imposes a duty on the trustees to avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan.

*Bierwirth,* 680 F.2d at 271. Where the trustees are in such a position that their judgment can "scarcely be unbiased, at the least they [are] bound to take every feasible precaution to see that they ... carefully consider[ ] the other side, to free themselves, if indeed this [is] humanly possible, from any taint...." *Id.* at 276.

■ A second problem especially common in control contests concerns the trustees' duty to monitor each side's communications to participants. To qualify for favorable tax treatment under Internal Revenue Code § 409, the ESOP typically will contain a provision for "pass through" voting by the participants. As noted above, this means, basically, that each participant can direct the ESOP trustees how to vote the shares allocated to his or her individual account in the ESOP. Not surprisingly, "[e]ach of the contesting parties will want to be able to communicate quickly and frequently with the participants." *Employee Benefit Plans in Control Contests: An Analysis of Participant "Pass Through" Arrangements* ("Employee Benefit Plans"), 17 Pens.Rep. (BNA) No. 30, at 1290, text accompanying note 122 (July 23, 1990).[35] In this situation, according to the Department of Labor, the trustees' fiduciary duty requires that they ensure "that necessary information is provided to participants, that false or misleading information is not distributed to participants, ... [and that] the participants ... rendered an independent decision ... *without pressure from their employer* as to how to vote ..." *Labor Dep't Adv. Op. on Fiduciary Responsibilities in Connection with Attempted Corporate Takeovers* ("CHH Letter"),[36] 11 Pens. Rep. (BNA) No. 19, at 633 (May 7, 1984) (emphasis added).[37] Of course,

> [w]hat constitutes 'necessary' information will vary with the circumstances of each situation.... As a practical matter, ... the trustee should ensure that participants receive at least basic relevant information necessary to an informed decision (e.g., proxy materials, ...), and should supplement such materials with additional 'neutral' information as *necessary to explain the participants' pass through rights and the procedures for exercising them.*

*Employee Benefit Plans,* text accompanying note 70 (emphasis added).[38] Also, "the trust-

---

**35.** Indeed, as the author of the above-cited commentary notes, often the ESOP will have been established to serve as an anti-takeover device, the idea being that the ESOP will own a significant amount of the company's stock and (because the voting of that stock will be directed by the company's employees by means of the "pass through" mechanism) will, in a control contest, be friendlier to incumbent management than to a hostile "raider."

**36.** So named because the "advisory opinion" is actually a letter from the Department of Labor to counsel involved in the 1984 contest for control of the Carter Hawley Hale corporation.

**37.** If a participant's voting decision is the result of improper pressure, it must be disregarded, *id.,* a consequence also mandated by federal regula-

tion. *See* 27 CFR § 2550.404c–1(c)(2)(i) (a plan participant does not exercise "independent control," and the pass through is invalid, where the participant "is subjected to improper influence by a plan fiduciary or the plan sponsor with respect to the transaction"). Neither side cites this regulation.

**38.** The commentary cited is, of course, merely suggestive. In this instance, however, its suggestions make good sense. Also, it might be noted that, as observed in the preceding discussion of proxy rules under the Exchange Act, the trustees, apart from violations of their fiduciary duties under ERISA, might also have avoided any violation of Rule 14(a) had they furnished the ESOP participants with only "administrative and ministerial information relating to the mechanics of

ee (and other plan fiduciaries, *including management personnel acting in fiduciary capacities* ) should avoid giving advice or recommendations to participants regarding the voting...." *Id.*, text accompanying note 119 (emphasis added).

Unlike the problem of trustees' dual loyalty, the question of the trustees' obligations as "election monitors" in a pass through voting situation appears not to be the subject of any case law.[39] It is therefore necessary to draw "relatively specific implications from general statutory provisions." *See* Memorandum of the Secretary of Labor as *Amicus Curiae* Regarding Issues Presented by Motions for Summary Judgment, *Harris v. Texas Air,* CA No. 87–2057 (D.D.C.) ("DOL Memorandum"), text accompanying note 23. Nevertheless, given the Department of Labor's position in the CHH Letter, as reiterated in the DOL Memorandum, the basic idea seems simple enough: the trustees

(1) should provide neutral information to the participants explaining what a "pass through" voting right is and how to exercise it;

(2) should not advise the participants on how to vote (the participants are, after all, exercising ostensibly "independent" control over their allocated shares);

(3) should ensure that the participants receive sufficient accurate information to make an intelligent voting decision; and

(4) when asked to forward information to the participants, should ensure that the information is not false or misleading.

■ That is a rough sketch of the applicable law. No more nuanced or intricate description need be given, because the trustees' actions in this case constitute a flagrant breach of their fiduciary duties under any conceivable test. There are three trustees of the AMERCO ESOP: Joe Shoen, who is also AMERCO's President, Chairman of the

Board, and a director of the company; Gary B. Horton, who is also treasurer of AMER-CO; and Donald W. Murney, who is also Treasurer of U–Haul International (AMERCO's principal subsidiary). Apparently, all or most of the approximately 5,500 participants in the ESOP have the right to direct the trustees how to vote the shares allocated to their individual accounts. The two factions of the Shoen family control, between them, about 95% of the company's stock. About 5% of the company's stock is held by outsiders, either as allocated ESOP shares or as shares owned outright by individuals, and will constitute the "swing vote" in the next election. The allocated ESOP shares, though they constitute only about 2.8% of the company's stock, therefore represent over half of the swing vote (i.e., over half of that 5%), and the ESOP participants will cast crucial votes in the election.

The ESOP trustees, as explained above, were obligated in this situation to provide a neutral explanation of pass through voting; to ensure that the participants received relevant information; and to shield the participants, to the extent possible, from false or misleading information. Contrast these easily satisfied obligations with their actions. The very first thing the trustees did was place the story in the *U–Haul News* and the insert in the participants' payroll envelopes. Each of these contained a passable explanation of pass through voting. Each was also, more significantly, a blatant solicitation of the participants' voting directions on behalf of management. *See* Rappel Aff. Exs. HH, II. It is worth recalling here that the Department of Labor, in its CHH Letter, took the sensible position that the trustees must ensure that the ESOP participants are not pressured by their employer to vote a certain way. Understandably, it seems never to have occurred to the Department that the trustees *themselves* would pressure the par-

---

the pass through." *See id.* at n. 119; *see also* Rule 14(a)–2(a)(1)(ii), (iii).

**39.** It should be emphasized that the two problems need not occur together. The "dual loyalty" problem can occur where pass through voting is not an issue—for example, where, as in *Bierwirth,* the trustees must decide whether to tender the ESOP's stock holdings in the context

of a hostile tender offer, though this may result in a successful takeover causing the trustees to lose their jobs with the target company. On the other hand, the trustees may be completely independent and have no "dual loyalty" problem at all; they still would be bound to ensure fair pass through election procedures.

ticipants to vote a certain way; apparently, this was beyond the realm of predictable malfeasance. This aspect of the trustees' conduct constitutes such a clear violation of their duty to ensure "free and fair" pass through voting that, by itself, it justifies removal of the three current trustees and appointment of a neutral trustee in their place.

Unfortunately, that is not the end of the story. Paul claims that the ESOP trustees breached their duties to the ESOP participants not only by soliciting voting directions on behalf of management, but also, among other things, by (1) preventing him from communicating with the ESOP participants, causing the latter to be deprived of relevant information, and (2) voting against his proposals although those proposals would benefit the participants. Prelim. Motion at 14–19.

AMERCO's response to these charges is wholly unconvincing. It begins by claiming that the trustees acted correctly in refusing to distribute Paul's materials to the ESOP participants, because those materials "contained many inaccuracies and misrepresentations," AMERCO Prelim.Opp. at 23, and because they were delivered to the trustees only on July 15, six days before the scheduled meeting and too late to allow the participants to consider and respond to them. ESOP Prelim.Opp. at 17. It is true, as already noted, that the trustees must screen false or misleading statements from information distributed to participants. But the trustees' description of the claimed "inaccuracies and misrepresentations," *see* Affidavit of Kenneth B. Segel, Esq. ("Segel Aff.") ¶ 15, speaks for itself. The inaccuracies are typographical errors or minor ambiguities, easily corrected with an "errata" sheet. The only significant flaw is Paul's request that proxy cards be returned directly to him, rather

than to an independent vote-tabulating firm. *Id.* However, Paul points out that even this was not his choice: he was unable to secure AMERCO's co-operation in having all voting directions, no matter which side they supported, tabulated by an independent firm. *See* TRO Reply at 2–3.

Finally, Paul claims that the trustees breached their duties by voting against his shareholder proposals despite the fact that the proposals would benefit the participants.[40] Prelim. Motion at 19. ERISA trustees may consider only the economic benefits to the ESOP when making decisions. *Central Trust Co.,* 771 F.Supp. at 874. We need not ask, at this point, whether Paul's proposals actually would have benefitted the shareholders. The question, rather, is whether the trustees engaged in "independent and intensive investigation" before passing judgment on them. A relevant factor in that inquiry will be whether, and to what extent, "the use of the trust's assets tracked the best interest of another party." *Newton,* 756 F.Supp. at 1127.

In this case, Paul argues, not only did the trustees vote against his proposals—they did not even consider his proposals, inviting him only on July 18th to discuss the proposals despite the fact that they had already voted the non-allocated shares against the proposals on July 14th. Prelim. Motion at 20–21. The trustees, in response, argue at length that their Advisory Committee "met independently, conducted a lengthy meeting and recommended that [Paul Shoen's] materials should not be sent," ESOP Prelim.Opp. at 9, and that they themselves "formally met to discuss each of Paul Shoen's proposals and thoroughly analyzed the merits of each...." *Id.*[41]

---

**40.** He claims that his shareholder proposals would create a public market for AMERCO stock, which would benefit the ESOP participants in two significant ways: first, by eliminating the fifteen percent discount in the appraised value of the stock currently caused by its "illiquidity," i.e., by the fact that there is no public market for it and it therefore cannot easily be sold; and, second, by eliminating potential ESOP "put" liability under 26 U.S.C. § 409(h), which requires that, if a plan participant is entitled to a distribution from the plan, the participant has a right to demand that the distribution take the

form of the employer's securities, and, if there is no ready market for the securities, has a right to demand that the employer repurchase the securities. Prelim. Motion at 20.

**41.** It is worth noting that, at least according to Paul, "all three members of the Committee are appointed by Joe Shoen, and he can remove them without cause. The head of the Committee is Joe Shoen's Assistant." Prelim. Reply at 7 n. 7.

The trustees' brief—replete with references to, *inter alia*, lengthy meetings, independent judgment, Joe's abstention from certain votes, and an independent, untainted advisory committee—has an Alice in Wonderland quality to it. It cheerily ignores the fact that, by the time the trustees met, on July 15, they had already placed the story in the company newsletter, inserted the flyer in the payroll envelopes, and sent the "Final Notice of Voting Rights" and voting card to the participants. Each of these items, as already explained, was an outright solicitation, or was at least slanted, in favor of incumbent management and against Paul's shareholder proposal. It is utterly implausible that the trustees *then* met with open and neutral minds to consider Paul's proposals and candidacy.

### 5. *Summary of the Merits.*

 This is a motion for preliminary relief and no conclusive findings of fact can be made. However, based on the voluminous materials already submitted to the court, it appears overwhelmingly likely that:

(a) the AMERCO board breached its fiduciary duties under Nevada corporation law by advancing the annual meeting date, so that the meeting could be conducted before an arbitration decision which might render incumbent management unable to control Paul's shares for voting purposes, and before Paul had an opportunity to campaign for his candidacy and shareholder proposal;

(b) AMERCO violated SEC Rules 14a–6 and 14a–9;

(c) the ESOP trustees violated SEC Rules 14a–3 and 14a–4; and

(d) the ESOP trustees breached their fiduciary duties under ERISA by campaigning on behalf of incumbent management rather than remaining neutral and by refusing to forward "necessary information" (i.e., Paul's proxy statement) to the ESOP participants because of minor and easily corrected errors.

It therefore appears most likely that Paul will prevail on the merits.

### B. IRREPARABLE HARM.

As this court stated in its Order of July 20, "the denial or frustration of the right of shareholders to vote their shares or obtain representation on the board of directors amounts to an irreparable injury." *See Int'l Banknote Co. v. Muller*, 713 F.Supp. 612, 623 (S.D.N.Y.1989); *Hubbard*, 1991 WL 3151 at *5–6, 1991 Del.Ch. LEXIS 9 at *17–*18; *Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1208 (Del.Ch.1987).

### C. OTHER FACTORS.

The standard for granting preliminary relief is sometimes formulated to include other factors—the "balance of hardships" and the "public interest." The balance of hardships here favors Paul; he will, as noted above, most likely suffer irreparable harm, while the only harm to AMERCO will be that its meeting is further delayed. There is no indication that the daily operations of U–Haul will be interrupted in any way. The public interest plays little role in this case, as this is basically a dispute among private parties about private matters—money and control of a company. To the extent that the public interest is involved, it favors adherence to the law and thus weighs in favor of a grant of injunctive relief in this case. Paul has made the requisite showing and a preliminary injunction will issue.

### IV. REMEDIES.

It is perhaps indicative of the defendants' own assessment of the merits of this case that they devote large portions of their briefs to arguing that, even if an injunction issues, Paul is not entitled to the relief he seeks. The asserted reasons are numerous. AMERCO claims that, because the meeting has already been enjoined and "the entire process must begin anew, continued expenditure of time and resources to litigate the underlying merits of Plaintiff's claims would be an exercise in expense and futility." AMERCO Prelim.Opp. at 4–5. The company then argues, among other things, that Paul's "requested 'preliminary' relief is completely inappropriate because it ... demands final mandatory injunctive relief which can only be granted (if at all) after a full trial on the

merits," *id.* at 5; that "curative disclosures are improper at this 'preliminary' stage of the litigation," *id.* at 19; that even if it did violate Rule 14a–6, such a violation is de minimis and does not merit relief, *id.* at 19 n. 13; that appointment of a neutral trustee for the ESOP would constitute "extraordinary judicial action" and is "wholly inappropriate" in this case, *id.* at 24; and that Paul "cannot possibly suffer irreparable harm because everything done to date will be redone" and "the process must begin anew regardless of the outcome of this litigation." *Id.* at 28.

The ESOP trustees strike a similar chord. They claim to have "carried out their responsibility in accordance with" their "fundamental obligation" to act only in the participants' best interests. ESOP Prelim.Opp. at 2. More specifically, they argue that, pursuant to the Ninth Circuit's decision in *Acosta v. Pacific Enters.*, 950 F.2d 611 (9th Cir.1991), Paul has no right to a list of ESOP participants, *id.* at 11, and that Paul's request that a neutral trustee be appointed for the ESOP is "totally misplaced." *Id.* at 18.

This is not persuasive. If the only problem were that the AMERCO board had advanced the date of the annual meeting, then the first claim—that further litigation is unnecessary and that the entire matter should be remitted to AMERCO's internal corporate election process—might carry some weight, as the problem of the meeting date *simpliciter* was solved by this court's initial restraining order. Things are not so simple. The trustees have already "pre-conditioned" the ESOP participants to give voting directions in favor of incumbent management, and those solicitations have not disappeared. Curative disclosures are needed to remove their taint, to the extent it can be removed. Moreover, the prospect of restarting the election process with the same trustees in charge of the ESOP is not an appealing one. The trustees are mostly responsible for the problems that have already cropped up.

The defendants' other arguments are similarly without force. Assuming that Rule 14a–6 violations are de minimis, the plethora of other violations in this case is a sufficient basis for granting relief, completely apart from Rule 14a–6. Curative disclosures are,

despite the defendants' contentions, an appropriate component of injunctive relief. *See, e.g., Polaroid Corp. v. Disney,* 862 F.2d 987, 1006 (3rd Cir.1988). More generally, injunctive relief is particularly appropriate in this type of case: "in corporate control contests the stage of the preliminary injunctive relief, rather than post-contest lawsuits, 'is the time when relief can best be given.'" *Piper v. Chris–Craft Indus.,* 430 U.S. 1, 42, 97 S.Ct. 926, 949, 51 L.Ed.2d 124 (1977) (*quoting Electronic Specialty Co. v. Int'l Controls Corp.,* 409 F.2d 937, 947 (2nd Cir. 1969) (Friendly, J.)). The court has a great deal of discretion in deciding what that relief shall be, *see generally* IV L. Loss & J. Seligman, *Securities Regulation* 2111–19 (1989), and other courts have ordered many of the same remedies sought here (e.g., voiding of proxies already obtained, corrective disclosures, and sufficient time between date of order and meeting date to permit resolicitation). *See id.* at 2117 n. 515; *see also United Paperworkers Int'l Union v. Int'l Paper Co.,* 985 F.2d 1190, 1202 (2nd Cir.1993) (allowing sponsor of a section 14a–8 proposal to include in its sponsoring statement a description of trial court's adjudication that company's proxy statement violated Rule 14a–9). Similarly, ERISA authorizes plaintiffs to seek injunctions and "other appropriate equitable relief," 29 U.S.C. § 1132(a)(3), which logically implies that courts have the power to award such relief.

## A. NEUTRAL TRUSTEES.

The remedial issues most hotly contested by the parties are Paul's demand that neutral trustees be appointed for the ESOP and his claim that he is entitled to a list of ESOP participants' names and addresses. To the demand for appointment of neutral trustees, the current trustees' response is, essentially, that (1) ERISA does not preclude an officer of the plan sponsor (here, AMERCO) from serving as a trustee of the ESOP, (2) there is no urgent need for appointment of a neutral trustee, and (3) it would be most difficult to find anyone willing to serve as a neutral trustee. ESOP Prelim.Opp. at 17–19. AMERCO's response consists of a lengthy review of the substantive law set

forth above on this point, the gist of which is that there is no per se rule *requiring* a trustee with dual loyalty to resign in every case.

These responses are unconvincing. First, it is true that, under ERISA, AMERCO officers could serve as trustees of the ESOP. But the issue here is whether those officers' loyalties were so divided that they should have resigned their positions as trustees. Second, it may well be difficult, and expensive, to find anyone willing to serve as a neutral trustee in this case. That is unfortunate. It would be preferable to leave the current trustees in office, subject to a strict injunction that they act as absolutely neutral "election monitors." That would be possible if all the trustees had to do from this point on was forward information to the ESOP participants, explain the mechanics of pass through voting, and screen out false or misleading information. However, the trustees will play an even more important role in this election: inevitably, some of the ESOP participants, probably a significant number, will not return voting directions for their allocated shares. The trustees themselves will have to vote these "allocated but undirected" shares in the participants' best interests. As the plaintiff puts it, "[t]he ESOP [t]rustees ignored their obligation under the plan to disseminate essential information, and favored management in both their own solicitations and their processing of the contestants' election materials." Prelim. Reply at 16. As made clear by the discussion of the merits in this case, set forth above, that sums things up quite well. It also explains why the current trustees cannot be trusted to vote the undirected shares in a manner consistent only with the ESOP participants' best interests. Finally, with respect to AMERCO's argument that there is no per se rule requiring ESOP trustees with divided loyalties to resign, it suffices to say that, in light of what has already transpired in this case, clearly *these* trustees should have stepped down.

## B. LIST OF ESOP PARTICIPANTS' NAMES AND ADDRESSES.

The last contested remedial issue is whether Paul is entitled to a list of ESOP participants' names and addresses. This presents a difficult question. Each side cites, and argues the import of, the Ninth Circuit's decision in *Acosta v. Pacific Enters.*, 950 F.2d 611, 619 (9th Cir.1991), in which the court held that there was

> not a sufficient nexus between [the plaintiff-shareholder's] demand for a list of [ESOP] participants' shareholdings in the [company] for the purpose of soliciting votes in a proxy contest and the provision of benefits or defrayment of expenses under the [ESOP] to justify imposing a duty upon the [ESOP's] fiduciary to disclose such a list.

In this court's view, the passage quoted above—it is the passage upon which the parties focus their arguments—establishes only that the ESOP fiduciary has no general duty to disclose such a list to a record shareholder who is campaigning against incumbent management. The plaintiff in *Acosta*, however, made another claim: that the defendant company had engaged in self-dealing by using such a list for its own purposes. The court noted that

> [t]here is no evidence in the record that the defendants used a shareholdings list in a manner that constitutes self-dealing.... The record shows that Pacific Enterprises, as an employer, sent its employees letters and newsletters. There is no evidence in the record that it used any shareholdings list to solicit votes for the May 11, 1989, board of directors election other than the list of non-objecting plan participants that [the plan fiduciary] provided to [both] Pacific Enterprises and the [insurgent] campaign.

*Id.* at 620. In this case, by contrast, AMERCO itself has a list of the ESOP participants' addresses, *see* Affidavit of Matthew P. Feeney ("Feeney Aff.") Ex. F at 1 ("[t]he Company directly mailed its Proxy Statement to ESOP Participants"), and there is no indication that it obtained those addresses from a list of non-objecting beneficial holders (a "NOBO" list). Also, the defendants are correct to note that the participants' *responses*—i.e., how they vote—must be kept absolutely confidential from all parties (except, of course, for a report of aggregate votes), but

are incorrect to infer from this that the participants' *names* and *addresses* must be kept confidential, though such confidentiality is, all else being equal, desirable.

In summary, *Acosta* does not entitle the plaintiff to a list of ESOP participants, but does not bar provision of such a list as a remedial matter; AMERCO itself apparently has such a list; and, so long as the ESOP participants' voting decisions remain confidential and Paul uses the list solely to mail his materials to them, it would likely do no harm to require the ESOP to turn the list over to him. However, because neutral trustees will be appointed anyway, and because Paul seeks the list only as an alternative remedy in case the trustees refuse to mail his solicitation materials, his request will be denied—for if Paul has provided accurate solicitation materials, the neutral trustees will mail those materials directly to the participants and he will not need the list.

## V. *ORDER.*

For the above-stated reasons, the court hereby enters the following preliminary injunction, directed to the defendants, their agents, servants, employees, attorneys, and everyone to whom knowledge of this Order shall come:

**IT IS HEREBY ORDERED** that Joe Shoen, Donald Murney and Gary Horton are removed, effective immediately, as trustees of the AMERCO ESOP;

**IT IS FURTHER ORDERED** that three neutral trustees, with no material relationship to any party to this litigation and approved by all parties to this litigation, be appointed for the AMERCO ESOP, such appointment to be evidenced by a stipulation signed by the parties and filed with the court within fifteen (15) days from the date that this order is filed with the clerk;

**IT IS FURTHER ORDERED** that AMERCO shall compensate the neutral trustees for their reasonable fees and expenses, such compensation to include litigation expenses, if any, and the cost of an independent financial advisor's opinion;

**IT IS FURTHER ORDERED** that the new ESOP trustees, immediately upon their appointment as trustees, send a "curative" letter to all ESOP participants telling them that they should disregard any materials sent to them thus far, that any voting directions they may have given to the former trustees are now void, and that the election process will have to begin again;

**IT IS FURTHER ORDERED** that AMERCO's annual meeting is enjoined for a period of forty-five (45) days from the date that a neutral trustee is appointed, to allow sufficient time for resolicitation;

**IT IS FURTHER ORDERED** that all voting directions so far obtained from the ESOP participants are completely void;

**IT IS FURTHER ORDERED** that AMERCO comply with all SEC filing requirements;

**IT IS FURTHER ORDERED** that all defendants are specifically enjoined from committing any further violations of the federal securities laws;

**IT IS FURTHER ORDERED** that the solicitation and annual meeting process begin again, with the trustees playing a neutral role as supervisors of pass through voting;

**IT IS FURTHER ORDERED** that an independent firm, with no material relationship to any party to this litigation and approved by all parties to this litigation, be appointed to tabulate the voting directions, the results of said vote (except for the final, aggregate results) to be kept secret, permanently, from all parties to this litigation, and such appointment to be evidenced by a stipulation signed by the parties and filed with the court within fifteen (15) days from the date that this order is filed with the clerk.