**1524**

TOPANGA PRESS, INC.; Stuart Parr; Brand X Video Inc.; E.W.A.P., Inc.; Library One, Inc.; Hardrock, Inc.; Beverly Books, Inc.; Whitey, Inc.; New Wave, Inc.; N.F.M. Corporation; Plush Boutique; Carolina Enterprises; Dash, Inc.; Joth, Inc.; Joamar, Inc.; Jan Rubini; 7180 Sunset Blvd., Inc.; A.L.Q. Corporation, ·Plaintiffs–Appellees,

v.

CITY OF LOS ANGELES, Defendant–Appellant.

No. 91–55865.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 6, 1992.

Decided March 22, 1993.

As Amended April 27, 1993.

James K. Hahn, Claudia McGee Henry and L. Wayne Mooney, Deputy City Attys., Los Angeles, CA, for defendant-appellant.

G. Randall Garrou, John H. Weston, Weston, Sarno, Garrou & DeWitt, Los Angeles, CA, for plaintiffs-appellees.

Before D.W. NELSON, REINHARDT, Circuit Judges, and CALLISTER, District Judge.*

D.W. NELSON, Circuit Judge:

The City of Los Angeles ("City") appeals the district court's grant of a preliminary injunction prohibiting the City from enforcing its Adult Entertainment Business Zoning Ordinance, Los Angeles Municipal Code § 12.70, against the Appellees, owners of adult entertainment businesses ("Adult Businesses"). We affirm the order of the district court.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1977, the City Department of Planning conducted a study which found that concentrations of adult entertainment businesses were creating blight in the neighborhoods where the businesses were located. In re-

---

* The Honorable Marion J. Callister, Senior United States District Judge for the District of Idaho, sitting by designation.

sponse, the City enacted Municipal Code § 12.70 in 1978. Section 12.70 prohibits adult businesses from being established, substantially enlarged, or subject to transfer of ownership within 500 feet of churches, schools, parks, or within 1,000 feet of other adult businesses. The ordinance was enacted to prevent the "continued erosion of the character of the affected neighborhoods of the City" as described by the 1977 study.

Effective May 13, 1983, the City enacted Ordinance No. 157,538 which amended § 12.70B by adding the provision that each adult business was to be considered a separate business even if it operated in conjunction with a similar business at the same establishment. In addition, the ordinance amended § 12.70C to prohibit the maintenance of more than one adult business in the same building or structure. The ordinance, however, allowed multiple businesses established on or after September 1, 1978 to continue to operate until March 10, 1985, with an additional provision respecting the "grandfathering" of businesses established before September 1, 1978.

Effective January 13, 1984, the city council passed Ordinance No. 158,579, which forbade the establishment of any new adult business within 500 feet of any residential zone. Finally, Ordinance No. 161, 111, enacted in 1986, prohibited the continued operation after March 6, 1988 of adult businesses located within 500 feet of a residential zone. The 1986 ordinance also provided for the continued operation of such businesses whenever "a site consistent with 12.70C is not reasonably available elsewhere in the City for the establishment or relocation of the subject adult entertain-

ment business." A business existing on March 6, 1986 could continue to operate until March 6, 1991 if the business could establish undue financial hardship based on investment or the existence of a written lease extending past March 6, 1988.

The Adult Businesses [1] filed a joint complaint and separate individual complaints challenging the constitutionality of zoning ordinance § 17.70. They also brought three separate motions requesting a preliminary injunction against the City's enforcement of the ordinance.[2]

Without distinguishing among the three motions, the district court ruled from the bench on June 17, 1991 that plaintiffs had met the criteria for a preliminary injunction, and enjoined the City from enforcing the ordinance.

### STANDARD OF REVIEW

 The City raises the preliminary issue of the Adult Businesses' standing to assert the First Amendment rights of the general public. We review standing questions *de novo.* *Conti v. City of Fremont,* 919 F.2d 1385, 1387 (9th Cir.1990). A district court's grant or denial of a preliminary injunction will be reversed only where the district court either abused its discretion or based its decision on an erroneous legal standard. *Religious Technology Center, Church of Scientology Int'l, Inc. v. Scott,* 869 F.2d 1306, 1309 (9th Cir.1989). Under an abuse of discretion standard, this court cannot reverse the district court's grant of a preliminary injunction unless it has a "definite and firm conviction" that the district court committed a "clear error of judgment in the conclusion it reached."

1. Many of the plaintiffs own adult bookstores and at least two own an adult cabaret and two adult theatres.

2. The first motion joined by all twenty-two plaintiffs argued that the residency restriction: a) denied adult businesses a reasonable opportunity to relocate their businesses and thus infringed upon the plaintiffs' and the public's First Amendment rights; and b) improperly applied retroactively to pre-existing businesses. The second motion, joined by Brand X Video, Inc., Stuart Parr, New, Inc., E.W.A.P. Inc., N.F.M. Corp., Alex Wyszomirski, Beverly Books, Inc.,

Whitey, Inc. and Hardrock, Inc., alleged that the portion of § 12.70 which treats as separate businesses those stores which the City classifies as "multiple use" businesses: a) violates the First Amendment by indirectly outlawing certain forms of expression such as adult arcades that cannot economically operate except in conjunction with a related retail business; and b) violates the Equal Protection Clause. The third motion, joined by all twenty-two plaintiffs, argued that the ordinance is unconstitutionally vague in its definition of what constitutes an "adult" retail business.

*Abatti v. Commissioner,* 859 F.2d 115, 117 (9th Cir.1988).

## ANALYSIS

### I. Adult Businesses' Standing

■ The City contends the Adult Businesses are without standing in this court since they cannot employ the First Amendment rights of the public as a ground for the issuance of the preliminary injunction. While the Adult Businesses argue in their first motion for a preliminary injunction that enforcement of the ordinance will deny the public access to the type of entertainment they sell, the crux of their argument is that the ordinance infringes upon their *own* First Amendment rights. They argue that § 12.70 suppresses their protected speech by failing to provide them with reasonable alternative relocation sites for their businesses. Because the Adult Businesses have standing to protect their personal First Amendment rights, we need not decide whether they possess standing to assert the First Amendment rights of the public to have access to the types of expression sold by these businesses.

### II. The Preliminary Injunction

■ In support of their motions for a preliminary injunction, the Adult Businesses argue that the City has provided them with an insufficient number of possible relocation sites and that therefore enforcement of the ordinance would cause them hardship and irreparable injury. The Adult Businesses also argue that the ordinance raises serious questions of law. The City contends that all the evidence presented by the Adult Businesses regarding their threat of hardship went to the degree of economic harm they will face if the ordinance is enforced, and that the district court abused its discretion in considering this evidence since economic harm is not relevant to the issue of whether the Adult Businesses' First Amendment rights are threatened. The City also contends that the district court erred in finding that this case presented serious questions of law since the ordinance in question is constitutional on its face.[3]

■ In the context of location-restrictive ordinances, this circuit has determined that a preliminary injunction should issue upon a clear showing of either: (1) probable success on the merits and irreparable injury; or (2) sufficiently serious questions going to the merits to make the case a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party requesting relief. *Adultworld Bookstore v. City of Fresno,* 758 F.2d 1348, 1351 (9th Cir.1985); *Ebel v. City of Corona,* 698 F.2d 390, 392 (9th Cir.1983).

■ These are not two separate tests, but "merely extremes of a single continuum." *Benda v. Grand Lodge of Int'l Assoc. of Machinists & Aerospace Workers,* 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). Thus, a moving party need not demonstrate that he risks irreparable injury, but he must at least show that he will suffer a degree of hardship that outweighs the hardship facing the opposing party if the injunction is not issued. Similarly, a moving party need not demonstrate that he will succeed on the merits, but must at least show that his cause presents serious questions of law worthy of litigation.

### A. Economic Impact Under Renton

■ The question of purely economic injury is not relevant to the issue of whether a moving party faces hardship if a restrictive zoning ordinance is enforced. *Lydo Enterprises, Inc. v. City of Las Vegas,* 745 F.2d 1211, 1213 (9th Cir.1984). Rather, a lower court may only consider whether enforcement of the ordinance is likely to impugn the moving party's First Amendment rights. But, "[a]ny loss of First Amendment freedoms, even briefly, can constitute irreparable injury." *Id.* 745 F.2d at 1214;

---

3. The district court's preliminary injunction expressly found that the adult businesses had raised "substantial and non-frivolous legal and factual issues" and that "the balance of hardships" tips decidedly in favor of plaintiffs.

*Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976).

### 1. The *Renton* Test

The test for determining whether the Adult Businesses' First Amendment rights are threatened is whether a local government has "effectively den[ied] ... [the Adult Businesses] a reasonable opportunity to open and operate" their enterprise within the city in question. *City of Renton, et al. v. Playtime Theatres,* 475 U.S. 41, 54, 106 S.Ct. 925, 932, 89 L.Ed.2d 29 (1985). Again, the possible economic impact upon a business is not a factor to be considered by the courts when determining whether a city has provided a business with a reasonable alternate location. Adult businesses:

> must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees.... [A]lthough we have cautioned against the enactment of zoning regulations that have the 'effect of suppressing or greatly restricting access to lawful speech,' ... we have never suggested that the First Amendment compels the Government to ensure that Adult theaters ... will be able to obtain sites at bargain prices....

*Id.* at 54, 106 S.Ct. at 932 (citations omitted). This prohibition against consideration of economic impact specifically forecloses inquiry into whether a relocation site is "commercially viable" or only "potentially" as opposed to "actually" available. *Id.* at 53, 106 S.Ct. at 932.

The Supreme Court, however, has not stated what sort of factors *may* be considered when deciding whether the relocation sites provided by a city are reasonable. Some courts have attempted to draw a distinction between economically unsuitable land and physically or practically unsuitable land. *See Woodall v. City of El Paso,* 959 F.2d 1305, 1306 (5th Cir.) (per curiam) *modifying* 950 F.2d 255 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 304, 121 L.Ed.2d 227 (1992); *Alexander v. City of Minneapolis,* 928 F.2d 278, 283 (8th Cir. 1991). In *Woodall,* the Fifth Circuit held that "land with physical characteristics that render it unavailable for any kind of development ... may not be considered available for constitutional purposes under *Renton.*" 959 F.2d at 1306.

The problem, however, is that the distinction between economically unsuitable and physically or practically unsuitable land is difficult to maintain. Nearly all forms of physical and legal unsuitability may be couched in terms of economic unsuitability. Conversely, problems of economic suitability may be couched in terms of physical unsuitability. For example, in the instant case, some of the definitionally "available" land is currently used as runways for the Los Angeles airport. One could argue that this land is physically unsuitable for a business. On the other hand, one could argue that it is merely economically unsuitable, since there is nothing to prevent an adult business from physically relocating to this site; rather it is prevented by a consideration of the cost of tearing down part of an airstrip and then building a storefront. In short, it could be argued that the only impediment is the cost of development.

This easily blurred line between economic and physical suitability creates doctrinal problems. If the unsuitability of a relocation site always can be couched in terms of economic suitability, under *Renton* no relocation site could ever be considered unreasonable. On the other hand, if a court attempts artificially to maintain the line between physical and economic suitability, it may often be led to consider the economic factor *sub rosa* which is forbidden under *Renton.*

### 2. The Distinction Between Consideration of Economics Within and Without the Market

A solution to this gordian knot appears once we consider the context in which the *Renton* court forbade consideration of economic factors. Astutely, the *Woodall* court noted that "[t]he Court [in *Renton*] obviously contemplated that there was a 'market' in which businesses could purchase or lease real property on which business could be conducted." 959 F.2d at 1305. We agree with the observation of

the *Woodall* court. *Renton* assumed that the relocation sites were already part of the relevant real estate market. *See e.g., Walnut Properties Inc. v. City of Whittier,* 861 F.2d 1102, 1109 (9th Cir.1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 157 (1989) (forbidding consideration of economic factors that stem from "market force").

■ Accordingly, we do not think that *Renton* forbids a court to consider economics when evaluating whether a particular relocation site is in fact part of the real estate market. For purposes of *Renton,* the distinction is between consideration of economic impact *within* an actual business real estate market and consideration of cost to determine whether a specific relocation site *is part* of the relevant market. A court may not consider the former, but it may consider the latter when determining whether a specific site is reasonably suitable for the operation of a business.

### 3. The Hardship Inquiry

■ There are two questions then that must be answered when determining whether an adult business has been given a reasonable opportunity to relocate. The first question is whether relocation sites provided to a business may be considered part of an actual business real estate market. The second question is whether, after excluding those sites that may not properly be considered to be part of the relevant real estate market, there are an adequate number of potential relocation sites for already existing businesses.

The first question is the most tricky. For the reasons stated above, we do not find the distinction between economic suitability and physical suitability helpful in answering this question. Rather, we are left to the simple, yet slippery, test of reasonableness when attempting to discern whether land is or is not part of a market in which *any* business may compete. Inquiry into the question of whether it is reasonable to consider a particular location site as part of the commercial real estate market may focus either on the physical characteristics of an area or on the cost of

altering or developing the area to change its physical characteristics.

The case law offers clues as to what sort of land and/or structures reasonably may be said to comprise the relevant real estate market. *Renton* found that the city had met its obligation to provide alternate locations by providing 520 acres of land consisting of "ample accessible real estate," including "acreage in all stages of development from raw land to developed, industrial, warehouse, office and shopping space that is criss-crossed by freeways, highways, and roads." 475 U.S. at 53, 106 S.Ct. at 932. *Renton* did not mention, however, that part of the 520 acres offered to the adult businesses consisted of an oil tank farm, a horse racing track and a sewage treatment facility.

Subsequent to *Renton,* the Eighth Circuit in *Alexander* refused to consider economic impact but did consider whether there were potential *commercial* sites available. The *Alexander* court concluded that "numerous sites were potentially available ... [since] under the ordinance theaters of this sort have access to at least 6.6% of the *total acreage of commercial land;* within the available areas are a myriad of block faces, each a potential relocation site." 928 F.2d at 283. In *Dumas v. City of Dallas,* 648 F.Supp. 1061, 1071 (N.D.Tex.1986), *aff'd,* 837 F.2d 1298 (5th Cir.1988), *aff'd in part vacated in part,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), the district court restated the rule against consideration of economic impact. The court then cited with approval *Basiardanes v. City of Galveston,* 682 F.2d 1203, 1214 (5th Cir.1982), which held that areas located among warehouses, shipyards, undeveloped areas, and swamps did not provide adult businesses with a reasonable opportunity to relocate. 648 F.Supp. at 1071. In contrast, *Dumas* noted that the plan before it permitted relocation in areas with no "impediments" except for the possibility that as a "matter of business judgment" these relocation sites were undesirable." *Id.; see also Function Junction, Inc. v. City of Daytona Beach,* 705 F.Supp. 544, 552 (M.D.Fla.1987).

■ The courts' findings in these cases lead us to hold that a particular relocation

site may be considered part of the relevant real estate market when the following conditions are met. First, although *Renton* stressed that the First Amendment only requires a relocation site to be potentially available rather than actually available, the requirement of potentiality connotes genuine possibility. The Fifth Circuit has suggested that:

> [When a] business is operated pursuant to a lease that commits the property to the present tenant for its business purposes for a term of years, the property may be effectively unavailable to adult businesses or *any other business enterprise.*

950 F.2d at 262.[4]; *cf. Alexander,* 928 F.2d 278 ("the record clearly shows that other owners of adult businesses were able to find suitable relocation sites"). We need not determine whether the Fifth Circuit is correct. Here we need determine only that property is not "potentially" available when it is unreasonable to believe that it would ever become available to any commercial enterprise.

■ Second and focusing our attention on relocation sites which are within manufacturing or industrial zones, relocation sites that are reasonably accessible to the general public may also be part of the market. Third, areas in manufacturing zones which have a proper infra-structure such as sidewalks, roads and lighting may be included in the market. Fourth, when a relocation site suits some generic commercial enterprise, although not every particular enterprise, it too may be said to be part of the real estate market. While it is constitutionally irrelevant whether relocation sites located in industrial or manufacturing zones suit the *particular* needs of an adult business, potential sites must be reasonable relocation sites for some commercial enterprise before they can be considered part of the relevant market. Consequently, whether one defines a warehouse, a swamp, or a sewage treatment plant as

physically or economically unsuitable, it is not reasonable to define these sites as part of the real estate market that any business would choose.[5]

■ Fifth, and most obvious, those relocation sites which are commercially zoned are part of the market.

■ We emphasize that assuming a relocation site is part of the relevant market, it is not relevant whether a relocation site will result in lost profits, higher overhead costs, or even prove to be commercially infeasible for an adult business. The issue is whether any site is part of an actual market for commercial enterprises generally.

### B. *Adult Businesses' Hardship*

We turn now to the question of whether the district court in this case abused its discretion when it found that the Adult Businesses had met the hardship criterion for a preliminary injunction. The City argues that the district court improperly considered the commercial viability of the potential relocation sites for the Adult Businesses. We do not agree. The record in this case indicates that a real question exists about whether the ordinance provides the Adult Businesses with constitutionally sufficient alternative relocation sites for their businesses.

### 1. Excluding Offered Sites under *Renton* From Relevant Market

■ The first issue is whether the relocation sites offered by the City are part of the business real estate market.

The Adult Businesses' geographical expert, Michael Taugher, conducted an extensive survey of the City to determine which geographical areas within the City would be permissible as potential sites for establishing or relocating these adult businesses. Mr. Taugher found that there are 11,613.1 acres of what the parties call "definitionally available" relocation sites where the City

---

**4.** *Woodall* modified its opinion on April 21, 1992. The Fifth Circuit, however, did not disturb that portion of the original opinion quoted above.

**5.** We need not answer the question of whether, under *Renton,* a business has been afforded a

reasonable opportunity to relocate if all relocation sites are within an industrial zone and no commercial zones are offered; in this case, the City has offered both commercial and non-commercial relocation sites.

would allow an adult business to exist. Out of these 11,613.1 acres, however, Mr. Taugher concluded that much of the land was not truly available.

Mr. Taugher based his findings on what he termed "physical" or "practical" considerations. He found the following: 1) thousands of potentially available acres are submerged beneath the Pacific Ocean or the outer harbor of the Port of Los Angeles; 2) some of the land is presently being used as landing strips for the Los Angeles Airport; 3) two hundred acres are currently being used as landfill; 4) 600 acres are currently used as the Van Nuys airport; 5) 4,357.51 acres are currently used by the Port of Los Angeles and/or oil refineries; and 6) about 230 acres are used for petroleum gas storage. In addition, he found that the ITT Gilfillian Defense plant, the General Motor Assembly plant, a portion of Children's Hospital as well as other large businesses or institutions are located on "definitionally available" sites. He concluded that out of the 11613.1 acres of definitionally available land, only 7440.9 acres are "realistically available" for an adult business. Only 0.18% of this realistically available land is in a commercial zone.

Bruce Bailey, a real estate expert employed by the Appellees, used criteria similar to Mr. Taugher's. Mr. Bailey excluded those relocation sites that he considered physically inadequate such as parcels of land now occupied by junk yards, steel yards and car storage lots. He also excluded parcels of land that were occupied by "single purpose buildings" such as shipping yards, the Los Angeles airport, and a large oil refinery complex (id.). Mr. Bailey concluded that there were perhaps 120 "potentially viable" relocation sites that met the requirements of the zoning ordinance.

The City contends that these experts arrived at their conclusions by considering: 1) the commercial viability of the relocation sites; and 2) whether these sites were actually as opposed to potentially available. The City is correct that at times Mr. Bailey improperly considered factors such as whether relocation sites were operatively expensive or whether adult businesses would not be welcomed by landlords. Notwithstanding this, Mr. Bailey's final estimation of available relocation sites resulted from his reliance on factors other than commercial viability.

Applying the factors we have enumerated above, we believe that the areas eliminated from consideration by Mr. Taugher and Mr. Bailey are properly excluded under *Renton* since these areas do not fall within the relevant market. First, much of the land the Adult Businesses' experts considered unsuitable land is not potentially available. Land under the ocean, airstrips of international airports, and sports stadiums are not relocation sites likely to ever become available to the Adult Businesses, or indeed to any commercial business. Second, and turning to those relocation sites which are located in manufacturing zones, many of the areas excluded by Appellees' experts are not readily accessible to the public. Third, many of the sites the Adult Businesses' experts found to be unsuitable are inadequate for any generic commercial business. While *Renton* did not consider *undeveloped* land to be unsuitable for relocation, the Adult Businesses' experts testified that the City here has provided the Adult Businesses relocation sites that are *developed* in a manner totally incompatible with *any* average commercial business. Fourth, many of the excluded relocation sites appear to lack a proper infra-structure. In short, aside from the question of commercial viability, it is unreasonable to consider the acreage eliminated from consideration by the Adult Businesses' experts as relocation sites that fall within the business real estate market.

2. The Sufficiency of the Relocation Sites Within the Market

■ Once the areas that are not part of the market are excluded, the question becomes whether the remaining acreage provides the Adult Businesses with a reasonable opportunity to relocate. The parties agree that there are presently 102 different adult entertainment businesses in the city of Los Angeles. Of these 102 existing businesses, the City located five which it believed to be in compliance with all of the various restrictions of § 12.70. The Adult Businesses' expert Mr. Taugher concluded that all but one of the 102 adult entertain-

ment businesses could not meet the requirements of the ordinance.

At first glance, the 120 sites deemed practically available by Mr. Bailey would appear to be constitutionally sufficient, given that there are approximately only 102 adult businesses now in operation in the City of Los Angeles. Yet a more careful analysis of the evidence suggests otherwise. First, the number of businesses that need to relocate may be well higher than 102 since under the ordinance, single stores that sell two sorts of adult entertainment are to be considered multiple businesses and thus cannot operate at a single location.

Second, the estimation of the quantity of sites available within the market may well be inaccurate. Like the ordinance considered in *Walnut Properties, Inc.*, 861 F.2d 1102 (9th Cir.1988), this ordinance imposes a 1,000 foot separation requirement between any two adult businesses. This means, however, that as soon as any particular site is occupied by a new adult business, any other adult entertainment business is automatically precluded from relocating upon any other definitionally available plot within a contiguous 72 acre circle around the first business.

Mr. Taugher did not work out how much acreage was available after the 1,000 foot restriction was factored in to his evaluation. However, since many of the definitionally available areas were adjacent to each other, he concluded that acreage available to the tenth or twentieth business to relocate would be "dramatically less" than the percentage of area definitionally available to the first adult business. We have not estimated the number of sites available in either the commercial or the manufacturing zones of the city. However, it is clear from the map in the record that once the 500 foot residential restriction is factored in, the definitionally available locations are clustered together in several parts of the City. There is no doubt that the 1000 foot restriction between any two adult businesses would severely reduce the actual number of potentially available relocation sites. In addition, Mr. Taugher testified that he was not sure of the accuracy of his estimate of definitionally available sites. He did not determine whether portions of existing structures that were within a "definitionally permissible" area fell within a prohibited zone.

A corollary point is that there is a possibility that some of the sites included in the relevant market may be included improperly. If so, this also would reduce the number of reasonable sites potentially available. While Mr. Taugher roughly estimated the amount of land that could be considered "physically" or "practically" available, he did not determine whether there was a further decrease in available land due to factors such as inaccessability, lack of proper infra-structure such as lighting, road and sidewalk access, or the presence of other disabling characteristics of the site. In sum, a risk exists that a comparison between the estimation of the total number of adult businesses and the total available acreage is misleading.

Therefore, the district court did not abuse its discretion in finding that there would be serious hardship to the Adult Businesses if an injunction against enforcement of the ordinance was not granted.

### C. *City's Hardship*

Given that the Adult Businesses must not only show hardship, but that hardship tips in their favor, we turn now to the question of the potential injury to the City if the ordinance is not enforced. In *Lydo Enterprises,* this court presumed that an injunction which prevents a city from enforcing its ordinances *a fortiori* causes the City harm since "the city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect." 745 F.2d at 1213 (quoting *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976) (plurality opinion)). In this instance, however, the district court found that any harm the City might suffer was slight. The court noted that there had already been a "forbearance of enforcement of this regulation for a long time," implying that the City itself did not perceive enforcement of the regulation to be a matter of great urgency.

On this record, we cannot say that the district court abused its discretion in find-

ing that the balance of hardship tipped sharply in the Adult Businesses' favor.

### D. *Serious Questions of Law*

██ Next, we turn to the question of whether the district court erred in concluding that this case presents serious questions of law. The City argues that the district court erred because the ordinance is constitutional on its face and plaintiffs have failed to present evidence to raise any serious doubt to the contrary. We disagree. We have already concluded that the record indicates that the City may not have provided the Adult Businesses with reasonable alternative avenues of expression. This is a constitutional question which by definition is a "fair ground for litigation." *Adultworld Bookstore*, 758 F.2d at 1351. Moreover, this circuit considers zoning ordinance cases such as this to "present complex constitutional problems." *Id.* In this particular instance, the presumption of complexity is justified given that the answer to the question of what constitutes a "reasonable opportunity to open and operate" an adult business is not free from ambiguity.

### III. Attorneys' Fees

██ The Adult Businesses request an award of attorneys fees pursuant to 42 U.S.C. § 1988 should they prevail on appeal. Section 1988 provides that attorney fees may be awarded to a prevailing party in an action to enforce a provision of 42 U.S.C. § 1983. While the award of fees is discretionary, a court is expected to award such fees to the prevailing party unless there is some special circumstance which would justify the court's refusal. No such special circumstances exist in this case. Accordingly, we award the Adult Businesses attorneys' fees.

### CONCLUSION

██ We conclude that the district court did not abuse its discretion in finding that the balance of hardships tips sharply in favor of the Adult Businesses. We agree with the district court that the ordinance presents serious questions of law. Accordingly, the decision of the district court to

issue a preliminary injunction is affirmed. The Adult Businesses are to be awarded attorneys' fees.

AFFIRMED.